Case: 1:15-cv-06151 Document #: 11 Filed: 09/14/15 Page 1 of 46 PageID #:122

Ags

**FILED**
9/14/2015
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**RECEIVED**

SEP 0 4 2015 EAA
9-4-15
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Falanzo Marquest Hixson

_____

_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

Judge: Thomas M. Durkins

vs.

Micheal Lemke

   Durrant

   Maikowski

_____

_____

(Enter above the full name of ALL
defendants in this action.  Do not
use "et al.")

Case No: 15 C 6151
(To be supplied by the Clerk of this Court)

**CHECK ONE ONLY:**          **AMENDED COMPLAINT**

✓          **COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
U.S. Code** (state, county, or municipal defendants)

_____          **COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
28 SECTION 1331 U.S. Code** (federal defendants)

_____          **OTHER** (cite statute, if known)

*BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR
FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.*

I.    **Plaintiff(s):**

    A.    Name: Falanzo Marquest Hixson

    B.    List all aliases: N/A

    C.    Prisoner identification number: K-83547

    D.    Place of present confinement: Stateville Co. Center

    E.    Address: P.O. Box 112    Joliet, Illinois 60434

(If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

II.   **Defendant(s):**
(In **A** below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in **B** and **C**.)

    A.    Defendant: Micheal Lemke

        Title: Warden

        Place of Employment: Stateville Co. Center

    B.    Defendant: Durrant

        Title: Sargent

        Place of Employment: Stateville Co. Center

    C.    Defendant: Maikowski

        Title: Lieutenant

        Place of Employment: Stateville Co. Center

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

Revised 9/2007

III. **List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:**

A. Name of case and docket number: _N/A_

B. Approximate date of filing lawsuit: _N/A_

C. List all plaintiffs (if you had co-plaintiffs), including any aliases: _N/A_

D. List all defendants: _N/A_

E. Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): _N/A_

F. Name of judge to whom case was assigned: _N/A_

G. Basic claim made: _N/A_

H. Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): _N/A_

I. Approximate date of disposition: _N/A_

**IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.**

Revised 9/2007

Defendants

1. SGt. Durrant (first name unknown) is At All times mentioned herein, is a Sergeant At Stateville Co. Center. He is/was assigned to the F. CellHouse. He is responsible for the day to day operations of Said CellHouse. He is being Sued in his individual and Official Capacities.

2. LT. Malkowski (First Name Unknown) is AtAll time mentioned herein is a lieutenant at Stateville Correctional Center. He is/was assigned to the F Cellhouse. He is responsible for the Supervison the F. Cell House. He is being Sued in his individual and official Capacities.

3. Warden Michael Lemke, is at All times Mentioned herein, is/was the Warden at Stateville Co. Center. He is legally responsible for the day to day operations at the facility. He is being Sued in his individual and official Capacities.

# IV. Statement of Claims

1. In May of 2013, Plaintiff was taken to a cell in F-House (152) for a disciplinary infraction. The cell plaintiff was in was infested with spiders, roaches, mice and black mold. In Addition to the paint in the cell, which is lead based, was peeling. On June 2, 8, 15, 18 and 21 of 2013, plaintiff wrote defendants Lemke, Durrant, and Malkowski requesting that the living conditions he was being subjected to be abated (See letters As Exhibit A) Said condition/request were never abated or addressed. On June 28, 2013 plaintiff was moved to cell 432 in the F-cell House where he was again subjected to the same inhumane living conditions he was subjected to in cell 152. On July 3, 2013, plaintiff again wrote defendant Lemke about said living condition and again defendant failed to respond. (See letter marked Exhibit B)

On July 20, 21 and 24, 2013, plaintiff wrote defendants Malkowski, DR. Davis, DR. Obaisi and Warden Lemke concerning extreme pain he was having in his right ear. (see letters As Exhibit C).

On 8-6-2013, plaintiff was taken to the Health Care Unit E.R. DR. Davis examined plaintiff ear, flushed it out only to discover that several roaches had crawled into plaintiffs



VI

Statement of Claims Cont.
E2R (SEE DR. Davis Report As Exhibit D)
On 8-13-13 plaintiff wrote defendant lemke
advising him about his Medical Situation and
his belief that the inhumane living Conditions
Was a Direct Cause of it. (SEE letter AS Exhibit E)

(Exhibit F)
John Howard Association Report on Stateville
Co. Center living Condition. (SEE page 4 of 20)

**V.     Relief:**

State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.

Compensatory damages in the amount of $7,000 per each defendant. Punitive Damages in the amount of $9,000 per Each defendant. Damages for physical and mental Suffering in the amount of $9,000 Per Each Defendant. Plaintiff Seeks and recovery of Cost in this Suit, and Any and additional relief this Court deems Just, Proper, and Equitable.

**VI.     The plaintiff demands that the case be tried by a jury.   ☑ YES     ☐ NO**

## CERTIFICATION

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief.  I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this **28** day of **August**, 20**15**

_____
(Signature of plaintiff or plaintiffs)

Falanzo Hixson
(Print name)

K-83547
(I.D. Number)

P.o. Box 112
Joliet, Il - 60434
(Address)

Revised 9/2007





*Exhibit #1*

June 2ⁿᵈ 2013

To: Sergant Durrant
From: Falanzo Hixson # K-83547
Subject: Conditions Of my Cell

Mr. Durrant, I AM Currently Housed in Cell #152. Sir, my Cell is infested with Roaches, mice And/or Rat's, Spiders And Other Seasonal bug's. MoreOver, the back Wall of my Cell is Covered with Black mold and there are paint Chipping And the Peeling of paint All over my Cell. I Would Truly Appreciate it if the Above described Conditions Could be Remedied.

Respectfully

Falanzo Hixson K-83547

*(Exhibit #2)*

To: Sergeant Durrant       June 8th 2013

From: Falanzo Hixson K83547

Please Acknowledge: This is my Second letter Of Complaint (AFTER Several Verbal Complaint's) Concerning The Conditions of my cell (#152) Sir As i described in my 1st letter, My cell is infested With Roaches, mice, And Rats, Spider's As well As Seasonal bug's.

Also the back of my Wall is Covered With Black Mo And there Are Paint Chipping's And Paint Peeling's All over my cell, I Even found a Spider Crawling in my food Tra

Sergeant Durrant, Can you At least Find A Seg gation Cell where these Condition's don't Exist And move me there. If not, Can you Eliminate the inhumane Conditions in my cell.

Respectfully

Falanzo Hixson #K83547

To: Lieutenant Malkowski          June 15th 2013
From: Talanzo Hixson #K83547
Subject: Condition of my Cell

After Several Verbal Complaints' i Wrote Sargeant Durrant Two (2) Complaining letter's Concerning the Condition of my cell (152) Sir, my cell is infested With Roache's, Mice And/or Rat's, Spiders And Seasonal Bug's. There ARE Paint Chipping's And Paint Peeling All over Cell, As Well As Black Mold All over the back Wall Since I been in this Cell I had a spider Crawling on my food Tray, Not WithStanding the Conversation i he With a Maintenance Man, Who indicated to Me that When this paint Peel And chip off the Wall, I am being Exposed to Asbestosis, LT. Malkowski, Can you please fix these inhumane Conditions Which is in Complete opposite to my Constitutional Rights.

Talanzo Hixson
#K83547                              Respectfully

To: LT. MAIKOWSKI                                    June 18TH 2013

From: Falanzo Hixson #K83547

Subject: Conditions Of My Cell

    I Am Occupying Cell #152. I have Verbally Complained to SArgeant Durrant As well As wrote letters of Complaint to him, and to you As Well.

    I Am Constantly being Exposed to Asbestosis, chip And peeling paint off the wall's. The back Walls of my Cell is Covered with "Black Mold" Not to Mention my Cell being infested With Roaches, Mice, And/or Rat's And Seasonal bug's. These Above Mentioned Condition's Are A Violation of my Constitutional Rights. I Would highly Appreciate it if you Could Fix these Conditions

Respectfully

Falanzo Hixson
#K83547

(Exhibit #5)

To: Warden M. Lemke    Date: June 21st 2013
From: Falanzo Hixson #K83547
Subject: Exposed To life Threating Conditions

Warden Lemke, I have been in Segregation Cell #152
Since May 30th 2013. Since I been in this Cell I have
been Exposed To paint Peelings And chippings which Event
(According to Maintenance) Exposes me to Asbestosis.
NotWithStanding the fact that my cell is "infested"
With Roaches, Spiders, Rats And/or Mice As Well As
Seasonal insects.
    The back of my cell Wall is Covered with Black M.
"Inhaleing Asbestosis And Black Mold is truly A
deadly Combination! MoreOver, one day i was about
To Eat my food And there was a Spider in it.
The condition's of my cell is Not only life threating but
it Violate's my Constitutional Right's,
    I would Appreciate Sir if these inhumane Conditi
Are Remedied.
                    Respectfully

                    Falanzo Hixson K-83547

# EXHIBIT

# B

*Exhibit #6*

To: Warden M. Lemke                                    July 3'
From: Falanzo Hixson #K83547

I am presently Occupying Cell #432. from May 30'
2013 until this very day, I have And Still is Expose
To inhumane, Life threating Conditions which is
directly in Conflict with my Constitutional Rights.
   Sir I Am not looking for the Ritz Hotel Condition
I'm only Seeking to live without the infestation o
Seasonal insect's, mice, And/or Rat's Spider's And Roach
As it was in my old Segregation Cell #152

   Warden Lemke, I would Appreciate it if
you Could Eliminate these inhumane Condition

                              Respectfully

        Falanzo Hixson
            K83547

# EXHIBIT

# C

Exhibit #9S

To: LT Malkewski.                    July 20, 2013
from: Falanzo Hixson #K83547
Subject: Pain in my Right Ear

    I Can't hear out my Right Ear, I Am Constantly
hearing Crackling in my Ear. And I am Experiencing
Extreme Pain to the Point where i Can't Sleep. I stick
Things in my Ear to try and stop the Crackling. But
Nothing Works.
                              Respectfully

Falanzo Hixson
 K-83547

(Exhibit #10)

To: Dr. Davis                          July 21, 2013
From: Falanzo Hixson #K83547
Subject: Pain in Right Ear.

  I'm Writing you because I been trying to get
my Ear checked out Cause, i can't hear out my Right
Ear. And i am Constantly hearing Crackling in my Ear,
The pain is to a point where I can't Sleep, Ive Even
Tried Sticking things in my Ear but Nothing Works.

Falanzo (Hixson) #K83547          Respectfully

Exhibit # 11

To: Dr. Obasis,                                           July 21, 2013
From: Falanzo Hixson #K-83547
Subject: Pain in Right Ear

I'm writing you because I've been trying to find
out what is wrong with my Right Ear. I Can't hear out
of it, And I'm Constantly hearing Crackling in my Ear, The
Pain is so bad i cant Sleep. I even tried Sticking things
in my Ear, But Nothing works.

                                              Respectfully
Falanzo Hixson #K-83547

(Exhibit # 12)

To: Warden M. Lemke                           July 24TH 2013
From: Falanzo Hixson #K-83547
Subject: Pain in Right Ear

    Warden Lemke, Sir i'm Writing because I been
Trying to get Medical Attention Cause i Can't hear out
my Right Ear, Except For Crackling Sounds, The Pain is So
Bad i Can't sleep, I tried sticking things in my Ear
But Nothing Helps. I've wrote Both DR Obosis and DR. Davis
But nobody Responded.

                              Respectfully

Falanzo Hixson #K-83547

# EXHIBIT

# D

(Exhibit #14)

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Stateville Correctional Center**

Offender Information:

Last Name: Hixson
First Name: Falango
Mi:
ID#: K83547

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| | MD Note | |
| 8/6/13 | Presents to HCU for eval of ear discomfort (right) which has been present x 3 weeks. | → Cortisporin Otic 4 drop QID x 3 days |
| | O: V.S Noted | |
| | Gen: Awake, alert + oriented | |
| | HEENT: Arthropod seen, right canal. Flushing removed it. Some residual erythema. | |
| | A/P: Arthropod, right ear canal - Now removed. Rx Cortisporin otic. F/n prn. At CMS | |
| | noted [illegible signature] 8/6/13 | |

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Printed on Recycled Paper

# EXHIBIT
# E

(Exhibit #15)

To: Warden M. Lemke          8/13/13
From: Falanzo Hixson * K-83547
Subject: inhumane living Conditions | Inadequate Medical Care

Warden Lemke, After Many letter's of Complaint And one (1) Grievance, The Root of my Constant Excruciating pain in my Ear was discovered!

i went to the hospital to have my Right Ear Flushed out And To Me, Nurse Candice, Wendy, Lydia And Dr. Davis Suprise, Roaches was Flushed-Out my Ear

I was Also diagnois with having A Swollen and infected Ear. I was prescribed Some Ear Antibiotics (Neomycin and polymyxin B Sulfates and Hydrocortisone Otic)

I Requested Some medication For my pain To Dr Davis But to no Avail. Dr. Davis Responce was, lets See how this Antibiotic work First.

Can, be Scheduled to See the doctor As Soon As Possible So i Could get Some pain medication.

Respectfully
Falanzo Hixson K-83547

# EXHIBIT F



# John Howard Association of Illinois

375 East Chicago Avenue, Suite 529 Chicago, IL 60611
Tel. 312-503-6300 Fax. 312-503-6306 www.thejha.org

# Monitoring Visit to Stateville Correctional Center
# 7/13/2011

The John Howard Association (JHA) visited Stateville Correctional Center (Stateville) on July 13, 2011. Stateville, a Level One maximum-security adult male facility, first opened in 1925. It is located in Crest Hill, Illinois, about one hour southwest of Chicago.



**Vital Statistics:**

Population: 1,608
Rated Capacity: 978
Average Annual Cost per Inmate: $32,693
Average Age: 35
(Source: IDOC, 12/4/11)

**Key Observations:**

- Stateville is the most complex of all Illinois' prisons, containing general population, segregation, and protective custody units, as well as housing inmates on temporary court and medical writs awaiting transfer. Stateville is also situated next to the Northern Reception and Classification Center (NRC), the major adult male intake and classification unit for the state of Illinois.

- Stateville is home to the roundhouse, the only functioning panopticon in the United States.

- Stateville suffers from significant staffing shortages, particularly in mental health, medical and clerical positions.

- Despite the efforts of the administration, parts of Stateville are infested with pests and vermin.

- The racial makeup of Stateville's population is roughly 69 percent African American; 19 percent White; 12 percent Hispanic; and less than 1 percent Native American and Asian.

# Monitoring Visit to Stateville Correctional Center 7/13/2011

## Executive Summary

The John Howard Association (JHA) visited Stateville Correctional Center (Stateville) on July 13, 2011. Stateville, a Level One maximum-security adult male facility, first opened in 1925. Stateville is located in Crest Hill, Illinois, about one hour southwest of Chicago. It contains 1,664 double-cells in six units which house general population, segregation, protective custody inmates and inmates on temporary court and medical writs awaiting transfer. Stateville is situated next to the Northern Reception and Classification Center (NRC), the major adult male intake and classification unit for the state of Illinois. In addition, NRC contains a minimum-security unit (MSU) that houses 344 inmates who perform jobs at NRC and Stateville. This report covers Stateville and MSU. NRC is addressed in a separate JHA report.[1]

On the date of JHA's visit, Stateville and NRC together housed 3,319 inmates, well over the combined rated-design capacity of 3,162 inmates. Of these, 1,596 inmates were housed in Stateville, approximately 163 percent over that facility's rated capacity of 978 inmates. Since the time of JHA's visit in July 2011, Stateville and NRC's combined population has increased by roughly 400 more inmates.[2]

The population at Stateville cannot continue to increase at such a rate without dire consequences. Stateville's biggest challenges—severe overcrowding, understaffing, a grossly deteriorating physical plant, lack of education and inmate programming, and lack of resources to address these issues—are squarely beyond the control of the facility's staff and administration. It is the responsibility of Illinois' elected officials to find safe, cost-effective ways to reduce the state's prison population.

The effects of overcrowding, underfunding, and understaffing were evident throughout the facility, but most dramatically on display in housing unit F, the panoptic "roundhouse," which holds 400 inmates in double-bunk cells designed to house one person. The nearly 90-year old building, described in detail in the body of this report, has no place in a modern, civilized correctional system. Its grim conditions include persistent, noxious noise-levels; substandard heating, cooling and air ventilation; infestations of cockroaches and other pests; poor sanitation due to malfunctioning toilets, plumbing, and showers that are peeling and decaying; broken and non-functioning windows; and a physical plant that is overall dilapidated and falling apart. Because space is so limited and

---

[1] Monitoring Visit to Stateville Northern Reception & Classification Center 7/12/2011, available at http://www.thejha.org/NRC

[2] See Illinois Department of Corrections Quarterly Report, October 1, 2011, available at http://www.idoc.state.il.us/subsections/reports/quarterly_reports/DOC.pdf

the roundhouse holds multiple populations of varying security levels that must be kept separate, orchestrating inmate movement can be very difficult for correctional staff. Until recently, some staff, in a misguided effort to be more efficient, adopted the appalling practice of showering two inmates at a time under one showerhead. On discovering this, the current administration acted decisively to put a stop to this practice. However, JHA received reports from some inmates that this still occasionally occurs.

Subjecting inmates to such harsh, dehumanizing conditions has an injurious impact on their safety and physical and mental well-being, and increases the likelihood of prison violence.[3] It also undermines public safety and welfare, as recent studies show that harsh prison conditions do not improve inmates' post-release behavior, but tend to increase the likelihood of recidivism.[4] Further, poor prison conditions have a seriously deleterious impact on correctional staff who must work in this environment, greatly increasing their stress and workload pressure and making it more difficult for them to both monitor inmates and safely and effectively perform their jobs.[4]

Lack of adequate staffing, particularly medical and mental health staff, is also a major issue at Stateville. As detailed in the body of this report, Stateville is in desperate need of more physicians, psychiatrists, nurses and medical technicians to meet the health needs of a population that has a high incidence of serious mental and physical illness and is rapidly aging. In the face of insufficient medical staffing and resources, there is little question that inmates with serious health problems are suffering and going without adequate treatment at Stateville and facilities across the state.

As observed in prior JHA facility reports, this is a disaster in the making. Lack of adequate access to healthcare in Illinois prisons is not simply a humanitarian crisis. It is a public health crisis, as the failure to properly treat inmates with disease and illness endangers not only inmates and prison staff, but also the broader community to which inmates return when they are released. Ultimately, it is the public that bears the brunt when inmates with untreated infection and communicable disease are reintroduced into communities.[5]

---

[3] *See* Commission on Safety and Abuse in America's Prisons, *Executive Directives and Prison Violence* (2005), discussing how increased levels of inmate stress from harsh conditions are linked to increased individual and collective acts of prison violence, available at http ://www. prisoncommission.org/ statements/ thompkins_douglas.pdf.

[4] *See* M. Keith Chang, Yale University and Cowles Foundation, Jesse M. Sapiro, University of Chicago and NBER, *Do Harsh Prison conditions Reduce Recidivism?: A Discontinuity Based Approach,* available at http: //faculty. som. yale.edu/keithchen/papers/Final_ALER07.pdf

[5] See David M. Bierie, *The Impact of Prison Conditions on Staff Well-Being*, International Journal of Offender Therapy and Comparative Criminology (November 30, 2010).

[6] *See* John V. Jacobi, *Prison Health Public Health: Obligations and Opportunities,* 31 Am. J. L. and Med. 447, 466-467 (2005), documenting how the failure of prisons to adequately treat mental and physical illnesses is threatening the public with physical and financial harm, given that almost all of the more than two million persons incarcerated today will be released back into the community.

### *Recommendations:*

**(1)** The Illinois Governor and General Assembly must reduce the prison population through sentencing reform, enact a safe replacement for Meritorious Good Time, and provide Stateville and other DOC facilities with the funding and staffing needed to meet the population's basic medical and mental health needs. If such action is not taken, it is all but inevitable that that this issue will end up being litigated in the courts.

**(2)** To address the needs of its population and provide a safe environment for inmates to live and staff to work, Stateville needs more mental health, medical, and clerical workers.

**(3)** Stateville should continue to explore ways to provide programming to its long-term inmates, who are effectively barred from participating in educational and vocational opportunities.

## Introduction

This report examines the following issues: Housing & Living Conditions; Medical, Mental Health & Dental Care; Segregation & Protective Custody; Minimum Security Unit; Education, Programming, Jobs & Industries; Staffing Issues; Population & Facility Demographics.

## Housing & Living Conditions

Stateville contains a total of 1,700 beds divided among six separate living units. Units B, C, D, E, known as the "quarter units," each occupy a fourth of a single housing structure and house general population inmates. On the date of JHA's visit, roughly 1,100 inmates were double-celled in these quarter units.

Unit X, known as "X-house," contains 96 beds. It houses protective custody inmates and inmates who have newly arrived to Stateville and are awaiting orientation. On the date of JHA's visit, 83 protective custody inmates and four orientation inmates were housed in X-house. X-house is the building where death row used to be located before it was moved to Pontiac Correctional Center.[7]

Unit F, known as the "roundhouse," is a panopticon-style structure built in 1925. It is composed of a circular cell house surrounded by four tiers of cells with an armed guard tower situated in the center of the building. A variety of inmate populations are housed in the roundhouse, including segregation inmates, inmates transferred to Stateville on

---

[7] In 2011, Illinois abolished death penalty, and Governor Quinn commuted the sentences of everyone on death row to life in prison.

court writs who are waiting to be transferred for court hearings, and overflow inmates from general population and protective custody. The roundhouse has the capacity to house approximately 400 inmates and was full on the date of JHA's visit.

In addition, Stateville contains several unused housing units that together could house an additional 600 inmates in double-bed cells. Administrators previously explored whether these unused units could be opened so as to allow them to close the roundhouse. However, the idea was unworkable because these units require such a high number of staff to operate that they are cost-prohibitive.



JHA had the opportunity to visit both the roundhouse and X-house.

**The Roundhouse**

The roundhouse is the only functioning panopticon in the United States (see left image). The brainchild of 19th century British philosopher Jeremy Bentham, panopticons have a single center tower with rows of cells circled around it. The purpose of this design was intended to make it easier for one observer to monitor large groups of inmates. Bentham argued that the panopticon would also create "a new mode of obtaining power of mind over mind," as inmates would internalize the tower's gaze and eventually learn to monitor themselves.[8]

Whatever lofty goals Bentham envisioned for his panopticons, the reality of the roundhouse is far from ideal.[9] The most obvious, immediate problem presented by the roundhouse is a terrible, dysfunctional design. In every respect the roundhouse seems perfectly engineered to induce extreme aggravation, anxiety and stress among inmates and staff. In fact, the inmates, staff, and administrators that JHA spoke with seemed to universally despise the building. As one administrator expressed: "If we could take a wrecking ball to the roundhouse tomorrow, we would gladly do it."

The roundhouse's acoustics amplify sound to such a degree that all that can be heard upon entering is a deafening roar of yelling, talking and screaming and the persistent sound of banging on metal and brick. Because ambient noise levels are so high, a person in the roundhouse must raise his voice simply to be heard. In this chaotic, noisy environment, correctional officers are seriously handicapped in their ability to listen for signs of trouble or disturbance. The four-tiered cell design also makes it difficult for correctional staff to quickly access inmates.

[8] *See* Jeremy Bentham, *The Panopticon Writings*, 2010.

[9] *See* Michel Foucault, *Discipline and Punish: The Birth of the Prison*, 195-228, (Alan Sheridan trans., Vintage Books 2 ed. 1995) (1977).

By virtue of the circular design, inmates are also deprived of any remote semblance of privacy, as every inmate is constantly on display in his cell to the hundreds of other inmates in the roundhouse. Privacy and personal space are usually limited quantities in prisons due to safety issues. However, the roundhouse exacerbates lack of privacy by eliminating any and all possibility for privacy or personal retreat by putting inmates constantly on public display to a huge crowd of spectators. Without some privacy and personal space, inmates become tense and react with increasing hostility. As tension and hostility grow, security requirements likewise increase, creating a vicious cycle.[10]

The roundhouse's design is also costly and inefficient. Even the seemingly simple chore of changing a light bulb can be a huge undertaking because the high ceiling requires special equipment to accomplish this task on the fourth tier. The cells, originally designed to house single inmates, now mostly house two inmates apiece and are cramped, dilapidated and needing paint. Given the lack of insulation in the 1925 building, temperatures in roundhouse tend to be very hot in the summer and cold in the winter.

While the cells in the roundhouse contain small windows, these are also ill-designed to meet the needs of prison housing. Because the metal handles needed to open and close the windows posed a security threat and could be used as weapons, they had to be removed. Consequently, inmates have little ability to control window access and outside airflow in their cells.

The roundhouse showed every bit of its age on the date of JHA's visit and appeared decrepit and neglected. JHA observed broken windows in a number of inmates' cells. To keep out spiders and bugs, inmates had to place plastic and paper over the broken windows. The administration reported that, in winter, inmates also place plastic bags over the windows to try to keep out drafts. While the administration acknowledged this situation was far from ideal, it assured JHA that temperatures in all of Stateville's housing units are monitored in winter and are not allowed to go below 68 degrees. It is unclear, however, how this can be reasonably and cost effectively maintained without significant and immediate repair to the roundhouse.

Because the roundhouse must house multiple inmate populations of widely differing security classifications, the logistics of moving inmates to and from yard times, visiting rooms, showers and commissary is also complicated, as inmates in segregation, general population and protective custody must be kept separate. On average, general population inmates spend 21 to 22 hours a day in their cells, and are permitted a total of five two-hour personal visits per month (four visits on weekdays; one on the weekend), and one 30-minute personal phone call each week. However, general population inmates in the roundhouse complained that they were treated more like segregation inmates in that their privileges, commissary, and outside cell and shower times were more limited. While the general population is supposed to eat breakfast in their cells and lunch and dinner in the

---

[10] See U.S. Department of Justice, National Institute of Corrections, *Correctional Health Care: Guidelines for the Management of an Adequate Delivery System,* at 14 (December 2001).

dining area, inmates in the roundhouse reported they sometimes are not let out but are instead served lunch or dinner in their cell.

Most disturbingly, JHA learned that the pressure of having to orchestrate the movement of disparate populations led some staff to adopt the disturbing practice of placing two inmates at a time under one showerhead in a misguided effort to increase efficiency. Multiple inmates complained to JHA of being double-showered in this fashion. JHA adamantly disapproves of this practice as degrading, dehumanizing and dangerous. Stateville's administration agreed and has taken decisive action to end this practice.

The administration first discovered that the practice of double–showering was occurring months prior to JHA's visit and immediately issued a directive ordering staff to cease the practice. The administration indicated that since issuing this directive, the practice has declined sharply, although it still receives sporadic reports of staff double-showering inmates.

To ensure that the practice ends entirely, the administration routinely walks though the housing units, questions inmates, and encourages inmates to report any instance of double-showering directly to the warden or the assistant wardens. JHA encourages the administration to continue vigilant, ongoing efforts to ensure that this awful practice desists.

**Pest Control**

JHA received an overwhelming number of reports that the roundhouse is cockroach-infested. Multiple inmates expressed intense frustration and distress at their cells being "overrun" by cockroaches, particularly at night. Inmates reported they were anxious and unable to sleep because they were worried cockroaches would crawl into their ears or mouths as they slept. Some inmates reported putting toilet paper in their ears at night to keep out roaches and bugs. Although inmates indicated they were careful to keep their cells clean and free of open food items, this had no impact on the roach-infestation. Numerous inmates also reported infestations of birds and mice in winter. Across the board, inmates were extremely stressed at having to live and sleep in a noxious, pest-infested environment.

Cockroach infestation was a major issue when JHA last visited Stateville in September, 2010. It was apparent at the time of JHA's most recent visit that this remains an ongoing problem. The administration acknowledged that cockroach and vermin infestation is a chronic problem in Statesville's housing units, particularly the roundhouse. It attributed the pest problem to multiple factors, including the age of the facility and the fact that inmates store commissary food items in their cells. Environmental health and safety regulations also play a role, in that exterminators are prohibited from spraying pesticide directly into cell areas without temporarily moving inmates. Thus they can only spray the areas outside the cells. Exacerbating the situation, the administration reported that a prior vendor was found to have been using expired, water-down pesticide that was

ineffective to treat the infestation. The administration has since been allowed to hire a new vendor and is spraying two times a week to try and control the infestation. It reported that these measures are beginning to show some positive results in reducing the cockroach infestation.

JHA commends Stateville's administration for taking steps to address the pest problem, and encourages it to continue to do so. However, JHA remains extremely troubled by this situation. Infestations of cockroaches, mice and birds have serious health implications for inmates and staff because these are disease vectors. Further, living and working in vermin-infested environments is not only unsanitary and unhealthy; it also generates significant duress and tension for inmates and staff, which negatively impact the facility's stability and security.

While spraying pesticides is an important component of pest control, fixing broken windows and repairing cracks and holes in buildings to prevent pests from entering is arguably even more important. The harsh reality is that the administration simply does not have the funding or resources to address the multitude of serious physical plant problems in Stateville's aging housing units that are sustaining pest infestations. Nevertheless, implementing small measures, such as formally educating inmates on the importance of proper food storage and trash disposal and ensuring that inmates have ready access to trash disposal, cleaning supplies and sealable storage containers could potentially improve the situation. If the administration has not already explored implementing such additional small measures to assist in pest control, JHA would encourage it to do so.

Notably, several inmates reported to JHA that it was difficult for them to obtain cleaning supplies and hygiene products from staff. The administration indicated it has a set schedule for distributing cleaning and hygiene products to inmates once a week. It acknowledged, however, that staff members are sometimes lax in handing out these supplies. Ready access to cleaning and hygiene supplies is essential to good sanitation and health. JHA believes that having staff sign a login sheet documenting the dates and times that cleaning and hygiene supplies were distributed could help to alleviate this problem.

**Plumbing**

Another major housing issue reported by inmates in the roundhouse was malfunctioning toilets in the cells. Specifically, inmates reported that as a result of poor water pressure and/or aging plumbing, there is a 10 to 15 minute delay from the time a toilet is flushed to the time the water pressure builds up enough to allow the toilet to be flushed again. Thus, double-celled inmates cannot quickly and reliably dispose of human waste when they use the toilet in succession. Many inmates reported to JHA that they must delay defecating for this reason. Inmates also reported that the showers in the roundhouse were exceptionally dirty, peeling, molding.

Effective plumbing and sewage disposal are essential to eliminating disease pathogens, particularly in crowded living quarters. Delaying defecation can have health substantial consequences including abdominal pain, diverticuli, and hemorrhoids.[11] Even assuming the roundhouse's plumbing meets applicable health standards, the morale and mental well-being and inmates and staff are negatively impacted by having to live and work in filthy conditions.

Absent a costly total overhaul of Stateville's aging plumbing system, it is questionable how this issue can begin to be effectively addressed. To the administration's credit, however, it reported that the showers in the roundhouse were actively in the process of being actively scraped and repainted on the date of JHA's visit.

**X-House**

JHA also had the opportunity to visit X-house, which houses inmates in protective custody. While X-house's design does not present as many immediate physical plant problems as the roundhouse, its cells are also shabby and dilapidated. One of the most frequent reports heard from inmates in X-house, and from Stateville inmates in general, concerned the poor condition of their sheets, bedding, pillows, and mattresses. Many of the bedclothes and mattresses that JHA saw were threadbare, stained, frayed and in very poor condition. One inmate displayed a pillow that had disintegrated entirely and was crumbling into pieces. Another inmate indicated he had yet to be issued a pillow and was using wadded up clothing as a substitute.

Other inmates reported that clothing sizes did not fit, so they were forced to try to modify clothes on their own to try to make them wearable. One inmate that JHA interviewed demonstrated the problem, showing us how he rolled and tied up his oversized pants to keep them from dragging down.

JHA also received a significant number of reports from inmates distressed at the poor quality of the food, the absence of hot meals, and being routinely deprived of eating utensils. Some inmates reported that they lost substantial amounts of weight on transferring to Stateville and were underweight because food portions were so small and unpalatable. More than a few inmates also reported the presence of mice, mice droppings and roaches in the dietary unit, and a general lack of sanitation there. Several inmates also complained that the food carts used for food delivery were dirty and unsanitary as these same carts were also used to remove garbage and food waste. The administration confirmed that one set of carts previously was being used both to deliver food and to remove garbage. However, the administration has since instituted a policy and schedule to keep food carts and garbage removal carts separate and to have food carts washed once a day.

---

[11] *See* National Institutes of Health (NIH) Publication No. 95-2754, July 1995.

Some inmates also reported that access to commissary was sporadic and did not occur two times a month as scheduled.

Providing inmates with clean, serviceable bedding and clothing is not a luxury, but a basic living necessity. Adequate bedding and clothing are all the more essential to Stateville's inmates, given the coldness of the housing units in winter. Likewise, access to hygiene products, sufficiently palatable food in appropriate portions, sanitary food preparation and eating utensils are vital human needs.

## Medical, Mental Health & Dental Care

Stateville has a 32-bed air-conditioned infirmary which includes the mental health unit and eight suicide watch cells. The facility additionally contains a separate dialysis unit and a small unit for providing physical therapy.

Medical, mental health, dental and eye care services are provided through a mixture of state employees and private contractual employees through Wexford Healthcare. On the date of JHA's visit, there were four inmates on suicide watch and one terminally ill patient housed in the infirmary. Two inmates were receiving dialysis. To its credit, despite the pressures of understaffing, Stateville's administration ensures that inmates housed in the infirmary for an extensive period have an opportunity for weekly yard time.

**Medical Care**

The infirmary appeared clean and tidy when JHA visited. However, the dialysis clinic was rundown and poorly maintained. Parts of the floorboards had peeled away leaving exposed holes. There was duct tape on some of the walls and the floor appeared dirty. A large biohazard trashcan was positioned near the door with its contents exposed, uncovered by any seal or lid.

The dialysis unit runs six days a week from 3 a.m. until 9 p.m., and can accommodate three patients at a sitting. Inmates are shackled to their chairs during dialysis and at least two correctional staff must be present for every three inmates. If the demand for dialysis exceeds Stateville's capacity, inmates are sent to Graham Correctional Center for treatment as Graham also has a dialysis unit.

Stateville's physical therapy room is open a few days a week, and treatment is limited to large muscle therapy as there is not the staff or resources to provide intensive therapy. Staff indicated that there is a backlog to be seen in physical therapy. Staff reported there generally is a delay of two to four week from the time an inmate is referred for physical therapy to the time he receives treatment. With respect to eye care, Stateville is staffed with one part-time optometrist for a total of eight hours a week. Given this staffing level, JHA was not surprised to hear from an inmate that he had been waiting almost two years to obtain glasses.

Remarkably, even at optimal staffing levels, Stateville is authorized to employ only two full-time physicians. On the date of JHA's visit, one physician was away on extended-leave. This leaves only one full-time physician (37.5 hours per week) responsible for the health of 1,596 men. Making a grim situation worse, the facility was also understaffed with nurses and certified medical technicians at the time of JHA's visit. While

| Number of Stateville Inmates Diagnosed with Chronic Disease and Illness (Reported 11/30/11) | |
|---|---|
| Asthma | 165 |
| Cancer | 5 |
| Diabetes | 111 |
| Hepatitis C | 82 |
| HIV | 16 |
| Hypertension | 423 |
| Tuberculosis | 3 |

authorized for 21 full-time nurses (37.5 hours per week), only 13 of these positions were filled on the date of JHA's visit. This leaves a very low nurse to inmate ratio of 1:123. While authorized for 18 full-time certified medical technicians, only 10 of these positions were filled. Stateville staff indicated that their resources are being stretched to the limit, as there are enough staff and medical technicians to distribute medications and perform daily sick rounds. Stateville's administration was nevertheless hopeful that the situation would improve somewhat, as five new nurses had been hired and were in the process of orientation.

Although Stateville's medical staffing levels may appear shockingly low, they are on par with medical staffing levels at most Illinois prisons. Lack of adequate medical staffing is a systemic problem throughout the Illinois prison system, and Stateville is just another example of this. Making matters even more difficult at Stateville, when staffing levels at the adjoining Northern Reception and Classification Center (NRC) are low, medical staff are often pulled from their duties at Stateville to perform duties at NRC, leaving only a skeletal medical staff to serve Stateville's population. Stateville's administration also tries its best to keep lockdowns to a minimum because inmates who have chronic diseases, like HIV and Hepatitis C, cannot be seen and treated at their regularly scheduled appointments when the facility is on lockdown.

Under the circumstances, it was predictable that JHA received a very high volume of reports from inmates of poor medical care and lack of access to treatment. These reports ranged widely and included complaints of painful ear and throat illnesses going untreated for months and developing into acute infection; severe pain following an invasive surgery for a fractured hand going untreated and un-medicated; a pre-existing thyroid condition going un-medicated; prostate screening being denied to an elderly inmate after his father died of prostate cancer; and an inmate being denied X-rays and treatment for a fractured foot for several weeks. Numerous inmates reported substantial delays, ranging from one week to more than a month, from the time they put in a sick call slip to be seen to the time they were actually assessed and medically treated. Some inmates hypothesized the delays were the result of correctional staff not picking up sick call slips on a regular basis. Others hypothesized that the medical staff simply "hated them."

JHA has no information to either confirm or refute inmates' individual complaints regarding their healthcare experiences. However, the extremely high volume of medical complaints; the inadequate level of medical staffing; and the overwhelming sense among inmates of medical needs and physical suffering being met with indifference or hostility all point to a healthcare delivery system collapsing under the weight of demand.

At Stateville, the challenge of providing adequate healthcare is even more daunting because its inmate population is older, with a median age of 35, and includes more elderly and long-term prisoners. According to one administrator, the greatest challenge facing Stateville and DOC as a whole is this rapidly growing population of elderly inmates and the rising healthcare costs to care for them. This administrator warned that a crisis is on the horizon in Illinois corrections because they simply did not have the funding, housing, staffing, experience, or capacity to incarcerate a large elderly prisoner population.

**Mental Health Care**

Understaffing and lack of resources also challenge Stateville's ability to provide adequate mental health treatment to the population. At the time of JHA's visit, 488 inmates were under psychiatric care. Of these, 239 inmates were receiving psychotropic medication, two involuntarily. Despite the high volume of inmates' with mental illness, Stateville was authorized and employed one full-time psychologist (40 hours per week) and one part-time psychiatrist (30 hours per week). The majority of the psychologist's caseload consists of inmates in segregation.

A mental health staff member that JHA spoke with indicated that the facility's single greatest need is more psychiatrists and mental health professionals. Staff candidly admitted that the mental health needs of Stateville's population are much greater than the facility can provide for. Staff also indicated that it is often difficult to find and retain qualified mental health professionals because working in a prison environment with huge patient caseloads and minimal resources is extremely stressful and demanding. Stateville's administration agreed that additional mental health staff were badly needed.

Inmates receiving psychotropic medications are seen once a month by a psychiatrist for medication checks during the first three months of treatment, and less frequently thereafter. Staff reported that inmates who request to see a mental health professional are usually seen within two to three days. Stateville does not provide substance abuse treatment to inmates.

Staff reported that Stateville's population suffers from a wide variety of mental illnesses, including a significant number of inmates with bipolar disorder and schizotypal disorders. According to one staff, the severity of the mental illnesses and the number of inmates with severe mental illness has greatly increased throughout DOC over the last decade, coinciding with the closing of state mental hospitals and elimination of state, county, and community mental health treatment centers. An administrator reported to JHA that the

number of inmates actually requiring and sporadically receiving some form of mental health treatment at Stateville was probably closer to 900, or 56-percent of the population.

Another mental health staff member reported, however, that malingering is a big problem. JHA has encountered similar beliefs among medical and mental health professionals at other DOC facilities. This staff member did not specify how often inmates engage in malingering, but was of the opinion that it occurred very frequently. He explained that inmates had learned "legalese" and to mimic physical and psychiatric symptoms in order to obtain "secondary gains," like access to air conditioning in the infirmary, psychotropic drugs or pain killers.

JHA is troubled by the pronounced overemphasis on malingering among some DOC healthcare staff. Research confirms that fear of inmate malingering can lead correctional health care staff to under-medicate, under-diagnose and under-treat serious pain and illness in inmates, with disastrous consequences.[12] Undoubtedly, there are a number of inmates in the prison healthcare system, as in other healthcare systems, that exaggerate and feign symptoms of physical or mental illness to obtain secondary gains. However, it is also true that that manipulation and exaggeration are not per se inconsistent with genuine physical and mental illness. Indeed, in facilities like Stateville, where medical and mental health staff do not have the time or resources to adequately attend to inmates, the only option left for sick inmates to get necessary treatment and attention may be exaggeration or manipulation.[13] This vicious cycle is likely to persist as long as medical facility workers remain stressed due to understaffing; inmates continue to be housed in substandard conditions that adds to agitation, fear, and anger (see pg. 2); and inmates continue to feel a lack of transparency in their health care.

Federal studies confirm that *nearly half* of persons in prison are in fact suffering from mental illness. Further, persons in prison, often coming from backgrounds of severe poverty, neglect and substance abuse, are less healthy that persons in the general public and have higher rates of serious medical illness.[14] In short, the clinical reality is that poor

---

[12] *See* Michael S. Vaughn and Sue Carter Collins, *Medical Malpractice in Correctional Facilities: State Tort Remedies For Inappropriate and Inadequate Health Care Administered to Prisoners*, The Prison Journal vol. 84 no. 4 505-534 ( December 2004).

[13] Human Rights Watch, Ill-Equipped: U.S. Prisons and Offenders with Mental Illness at p.114, http://www.hrw.org/sites/default/files/reports/usa1003.pdf.

[14] According to the Bureau of Justice Statistics, 56 percent of state prisoners and 45 percent of federal prisoners have symptoms or a recent history of mental health problems. Further, prisoners have rates of mental illness-including such serious disorders as schizophrenia, bipolar disorder, and major depression-that are two to four times higher than members of the general public; 8 to 19 percent of prisoners have psychiatric disorders that result in significant functional dis-abilities, and another 15 to 20 percent will require some form of psychiatric intervention during their incarceration. In addition, according to a report by the Commission on Safety and Abuse in America's Prisons, poverty, substance abuse, and years of poor health care have left prisoners as a group much less healthy than average Americans; and inmates have higher rates of infectious diseases and chronic illnesses, including hypertension, asthma, cardiovascular disease, and diabetes. *See* Human Rights Watch: *Mental Illness, Human Rights and U.S. Prisons* available

health, chronic disease and mental illness are endemic and not merely fictional for most of the prison population.

**Dental Care**

Stateville is authorized for and employs two full-time dentists (40 hours per week), one part-time dentist (32 hours per week) and one full-time dental hygienist (40 hours per week). However, the administration reported that, pursuant to a labor contract, dental staff are only required to work 20 hours per week. While the administration attempted to renegotiate the contract to increase Stateville's actual dental coverage, an agreement could not be reached.

A dental staff member reported no waitlist for dentures or partial dentures, a six-month waitlist for fillings, and a waitlist of several weeks for dental extractions. However, if an inmate is in pain, staff tries to see him sooner.

There were four dental chairs in the unit, but one of the chairs was inoperable on the date of JHA's visit. In addition, the dental drill needed for fillings was not working. Thus, inmates with appointments, who had waited months for fillings, had to be re-scheduled. According to dental staff, one of greatest difficulties in meeting inmates' dental needs is the lack of reliable, functioning dental equipment. Because equipment, drills and dental chairs are in constant use, they wear out very quickly. Staff reported that they are in desperate need of new dental equipment because the existing equipment is old and constantly breaking, which has made backlogs for dental treatment even longer.

A dentist that JHA spoke with emphasized the importance of providing inmates with definite appointment dates, as this helped to relieve inmates' anxiety and reassure them that they would, in fact, be seen at some point, despite huge backlogs. From speaking with and watching this dentist interact with inmates, it was clear to JHA that she cared deeply about providing quality dental care to inmates and that the inmates under her care felt respected and well-treated.

## Segregation and Protective Custody

Stateville has the capacity to house a total of 162 inmates in segregation and 96 inmates in protective custody. On the date of JHA's visit, 137 inmates were in disciplinary segregation and 83 inmates were in protective custody. While inmates in segregation and protective custody are kept separate for all activities, they are treated virtually the same with respect to out-of-cell time and privileges.

---

at http:// www.hrw.org/ news/2009/09/22/ mental-illness- human-rights-and-us-prisons and *Confronting Confinement: A Report the Commission on Safety and Abuse in America's Prisons*, at http:// www. VERADC.org/pdfs/ Confronting_Confinement.pdf.

Inmates in segregation come both from Stateville itself and from other correctional facilities across Illinois. Stateville was designed and intended to hold inmates with six months or less left to serve in segregation, while Pontiac Correctional Center was intended to hold inmates with over six months segregation time. In the face of overcrowding and an ever increasing inmate population, the average length of time for an inmate in segregation at Stateville is now 13 months.

The administration reported that segregation inmates are permitted to shower three times per week. However, JHA encountered several inmates who reported that showers occurred one to two times a week. Notably, one segregation inmate reported that he had been unable to shower for two weeks.

Segregation inmates are limited to one 30-minute phone call and two one-hour "no contact" visits per month. Only one of the visits may occur on the weekend; the other must occur on a weekday. Segregation inmates are given one five-hour-block of yard time one day per week. While it would be preferable to distribute the five hours of yard time over several days to allow segregation inmates to leave their cells more frequently, Stateville's space and staffing levels are simply insufficient to allow this.

At Stateville, as at other Illinois facilities, prison jobs and educational and vocational programming are very limited, and segregation inmates by and large are excluded from participating in these entirely. Stateville's segregation inmates thus spend the vast majority of their time, roughly 23 to 24 hours a day, locked in their cells, socially isolated and idle.

As previously documented in prior JHA reports, the trauma of long-term social isolation, environmental deprivation, and lack of physical and mental activity in segregation can have serious, adverse physical and psychological effects on inmates, which, in turn, can have a damaging, destabilizing effect on a facility as a whole by increasing inmates' aggression, volatility and disruptive behavior.[15] At Stateville, the danger of segregation inmates deteriorating mentally, physically and socially is great, given mental health staff's report that a large portion of these inmates have mental illness.

One mental health staff member that JHA spoke with expressed the belief that segregation was a "therapeutic" for mentally ill inmates because it taught them "lessons they missed growing up, such as how to ask for what they need." This staff dismissed clinical concerns that segregation might exacerbate mental illness on the grounds that its therapeutic value outweighed any "miniscule" counter-indications.

While JHA does not doubt the professional integrity of this staff member, it has grave doubts about the professional viability of this judgment. A majority consensus in the fields of medicine, corrections, mental health, and social sciences, supported by a large

---

[15] See Prison Overcrowding: Harmful Consequences and Dysfunctional Reactions, Testimony of Professor Craig Haney, University of California, available at http://www.VERADC.org/statements/haney_craig.pdf.

body of literature, establishes that segregation, particularly long-term segregation, has a profoundly damaging impact on inmates' mental health.[16] A third party mental health professional consulted by JHA confirms this assessment. Notably, most correctional staff and administrators that JHA has spoken with, including an administrator at Stateville, have expressed the opinion that the added stress of segregation often has a negative impact on mentally ill inmates. JHA adheres to the position that the practice of using prolonged segregation, particularly with regard to mentally ill inmates, should be abandoned at all DOC facilities, including Stateville.

To its credit, DOC's administration, in partnership with the Vera Institute of Justice's *Segregation Reduction Project*, has continued to work on devising and implementing a plan to improve segregation conditions and reduce the use of segregation at Stateville and statewide. JHA fully supports DOC's ongoing efforts on this front.[17]

## Minimum Security Unit

The Minimum Security Unit (MSU) has three buildings consisting of one multi-use unit and two housing units. On the date of JHA's visit, 182 inmates classified as Level 7 (low-minimum security) were housed dormitory-style in Housing Unit One, and 162 inmates classified as Level 5 (high minimum security) and Level 6 (minimum security) were housed in Housing Unit Two. MSU inmates are permitted to have one one-hour visit with family and friends each weekend. Most of the inmates in MSU have job assignments, such as working in the kitchen or performing janitorial duties at NRC or Stateville. An inmate who worked full time, seven days a week as a cook and a janitor reported to JHA that he was paid $43.00 per month.

The MSU inmates that JHA spoke with uniformly reported that they worked seven days a week and rarely had a day off of work. Understandably, inmates felt exhausted and were frustrated with this situation. Although yard time is offered to MSU inmates two times a week in the morning, most inmates never have the opportunity to go to yard because they begin work at 5:00 a.m. An inmate explained that this was a serious dilemma because yard time was one of the only outlets they had for stress relief.

The administration acknowledged that MSU inmates often work seven days a week because their labor is much needed in NRC. However, the administration indicated that it

---

[16] *See, e.g.,* J. Metzner and J. Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, The Journal of the American Academy of Psychiatry and the Law, Volume 38, Number 1, (March 2010); Fred Cohen, Isolation in Penal settings: the Isolation-Restraint Paradigm, 22 Wash. U. Journal of Law & Policy 295 (2006); Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature,* 34 University of Chicago Crime and Justice (2006); Holly Miller and Glenn Young, *Prison Segregation: Administrative Detention Remedy or Mental Health Problem?* Journal of Criminal Behavior and Mental Health, Volume 7, Issue 1 (2006).

[17] *See* Vera Institute For Justice, *Research Update: Segregation Reduction Project* (November 2, 2011) available at http://www.VERA.org/blog/research-update-segregation-reduction-project.

was making efforts to fill beds at MSU which would reduce the number of work days for inmates and allow inmates to request a day off from work. JHA strongly encourages the administration to promptly take whatever steps are necessary to ensure that MSU workers are given days off from work each week and have the opportunity to relieve some stress through yard time.

A substantial number of MSU inmates (as well Stateville inmates) additionally reported that it sometimes took months for phone numbers to be added to their approved call lists. Thus, they were unable to phone friends and family for a long period of time. Other MSU inmates reported that access to commissary was and "hit or miss," in that usually had access once a week, but sometimes went several weeks without commissary. Inmates also reported that that mail delivery was often delayed by several weeks.

## Education, Programming, Jobs & Industries

Stateville offers little in the way of education, programming, vocational training or industry jobs to inmates. The reason is not lack of enthusiasm on the part of the administration, but the scarcity of funding and resources. Indeed, the administration expressed a strong conviction in the importance of education, job training and rehabilitative programming for inmates. Its philosophy, as stated by the warden, is that correctional institutions should truly be "correctional" and use education and rehabilitation to "reprogram" inmates, taking out the "bad" and replacing it with "good." The reality is that administration has limited resources and must make "difficult choices" to address the facility's most urgent needs. There currently is not the budget, space, staffing, security or resources to put its rehabilitative philosophy into action.

At the time of JHA's visit, two Adult Basic Education (ABE) classes were offered, with a total enrollment of 30 inmates. One GED class was offered, with a total enrollment of 25 inmates. In the preceding year, only nine inmates completed ABE and five obtained their GED. The administration reported that waitlists for classes are "always over 100" because there are so few instructors. The administration hoped to add an additional class in the next month after it completed hiring a new instructor.

Unfortunately, an extremely successful and popular creative writing program that was taught by a volunteer instructor was suspended the past year after the instructor passed away. The administration intended to try to keep the creative writing program going, but the logistics on how this would be accomplished had not yet been worked out. An art class geared towards long-term offenders is also taught at Stateville. The administration indicated that the waitlists for both the art and creative writing classes have always been exceptionally long because there is a huge demand for these programs.

The administration recently added a small, new pilot program, the SMART program, led by a volunteer instructor. The program teaches inmates stress reduction through yoga breathing techniques and practical coping skills to help inmates accept responsibility for their past actions and confront stressful situations more successfully in the future.

Stateville's administration was skeptical about the program initially, even though it was reported to have been very successful when used at Illinois River Correctional Center. The administration indicated that it has since unequivocally embraced the SMART program because it has seen real results in changing inmates' attitudes and behavior, and has expanded the SMART program by retaining a second volunteer instructor to teach a second class. There is a very long wait list to participate in the SMART program because classes are small, the class is extremely popular, and only a handful of spots are available.

JHA commends the administration on its efforts to increase programming, particularly through the use of volunteers, and strongly encourages it to continue to do so. Stateville has a long and successful history of using volunteers to enhance inmate programming and quality of life. In the face of budgetary and staffing cuts, increased reliance on volunteers could allow increased educational and rehabilitative programming for inmates to the greater benefit of the facility and the community at large when inmates are released.

As far as vocational training and jobs in industries, there are scarce opportunities for inmates. There is a barber training class, with 16 inmates enrolled. There are a few industry jobs employing roughly 25 inmates in making powdered soap and assembling wooden office furniture. In addition, 60 inmates are employed in the kitchen at Stateville and 36 are employed in the kitchen at NRC. An additional 57 inmates are also employed performing various maintenance and janitorial duties at Stateville.

The administration estimated there were about 250 work detail assignments in total, 70 of which were assigned to MSU inmates. According to the administration, the total number of programming assignments is roughly 400.

As at other facilities, preference for programming, classes and jobs is usually given to first time offenders and those with lesser sentences. Consequently, long-term prisoners and prisoners serving natural life have practically no opportunities for programming, jobs or education. This is unfortunate, as long-term prisoners can be an asset and stabilizing force in prison and serve as constructive mentors to younger prisoners, particularly in educational and program settings. [18]

## Staffing Issues

One of the biggest staffing challenges for Stateville is having to share staff with NRC. When new inmates arrive at NRC, correctional staff must be pulled from their duties at Stateville to process them through reception and classification. This leaves Stateville with only a minimal, skeletal staff, therein limiting its operations and inmate movement to what is basic and essential, which can interfere with inmates' ability access to the infirmary, yard, commissary, clinics, and the library.

---

[18] *See* Robert Johnson and Ania Dobrzanska, *Mature Coping Among Life-Sentenced Inmates: An Exploratory Study of Adjustment Dynamics*, Corrections Compendium (November, 2005) *available at* https://www.NCJRS.gov/App/Publications/abstract.aspxID=234313; and John Irwin, *Lifers: Seeking Redemption in Prison*, (Routledge) (2009).

Complicating matters further, because Stateville and NRC both lack sufficient clerical and administrative support staff, six correctional officers must regularly be reassigned from performing security duties to performing clerical work. Although authorized for 251 clerical/ administrative support staff, only 233 of these positions were filled on the date of JHA's visit.

From the perspective of inmates, Stateville's biggest staffing problems include lack of adequate paralegals and mail staff. At the time of JHA's visit, Stateville had only one paralegal, assisted by a few inmate law clerks. A staff member frankly admitted this was not enough to address inmates' legal needs. Efforts are made to accommodate inmates by prioritizing access to law library materials according to court filing deadlines. Inmates can request a copy of a specific case. However, performing general legal research is nearly impossible as the legal reference books available in the library are very outdated and are no longer being updated because of the expense.

With respect to the mailroom, there were three mail staff vacancies at the time of JHA's visit. Consequently, there is a delay in the delivery and processing of incoming mail of several weeks according to some inmates, one week according to the administration. While this situation is not ideal, it is vastly improved since the time of JHA's last visit to Stateville in 2010, when the delay in processing incoming mail was several months. The administration indicated that although it remains understaffed in the mailroom, it views mail processing as a priority, and thus will transfer staff from other departments to the mailroom in the event that mail processing becomes seriously backlogged.

## Population & Facility Demographics

The administration reports that, excluding those inmates sent to Stateville temporarily on court and medical writs, the average length of stay for an inmate at Stateville is six and one half years. The demographics of Stateville's population by class of offense is as follows: 1,118 inmates convicted of murder; 637 convicted of Class X offense; 537 convicted of Class 1 offense; 689 convicted of Class 2 offense; 212 convicted of Class 3 offense; and 500 convicted of Class 4 offense.

The racial makeup of Stateville's population is roughly 69 percent African American; 19 percent White; 12 percent Hispanic; and less than 1 percent Native American and Asian.

###

*This report was written by Maya Szilak, Director of the Prison Monitoring Project, for the John Howard Association. Maya may be reached at (312) 503-6302 or mszilak@thejha.org.*

*Contributing to this report were Megan Brady, JHA intern and citizen observers: Angela Weis, Mariya Kozlova, Laurie Jo Reynolds and Scott Main.*

Since 1901, JHA has provided public oversight of Illinois' juvenile and adult correctional facilities. Every year, JHA staff and trained volunteers inspect prisons, jails and detention centers throughout the state. Based on these inspections, JHA regularly issues reports that are instrumental in improving prison conditions.

 JHA's work on healthcare in DOC is made possible through a generous grant by the Michael Reese Health Trust.

IN THE

United States District Court Northern District
of Illinois Eastern Division

Judge: Thomas M. Durkins

Falanzo M. Hixson )
Plaintiff/Petitioner )
 )
Vs. )        No. 15 C 6151
 )
Micheal Lemke et Al )
Defendant/Respondent )

## PROOF/CERTIFICATE OF SERVICE

TO: Prisoner Correspondence          TO: _____
Clerks Office                            _____
219 S. Dearborn                          _____
Chicago, Il 60604                        _____

PLEASE TAKE NOTICE that on September 2, , 2015 . I placed the
attached or enclosed documents in the institutional mail
at Stateville                   Correctional Center, properly addressed to the
parties listed above for mailing through the United States Postal Service

DATED: 9/2/15                    /s/ Falanzo Hixson
                                 Name: Falanzo Hixson
                                 IDOC#: K83547
                                 Address: P.O. Box 112
                                         Joliet, Il
                                         60434

Subscribed and sworn to before me this 2nd day of Sept 20 15

_____
Notary Public

OFFICIAL SEAL
TYNEER BUTLER-WINTERS
Notary Public - State of Illinois
My Commission Expires 3/17/2019